```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------X
SEA TOW SERVICES INTERNATIONAL,
INC.,

              Plaintiff,

          -against-

TAMPA BAY MARINE RECOVERY, INC.,
a Florida corporation; ERICH A.
JAEGER; ABIGAIL JAEGER; KATHLEEN
MORENO; RAUL MORENO; TAMPA BAY
MARINE TOWING & SERVICE, INC.; and
PREFERRED BRANDS, INC.,

              Defendants.
-----------------------------------X
TAMPA BAY MARINE RECOVERY, INC.,
a Florida corporation; ERICH A.
JAEGER; and ABIGAIL JAEGER,

          Third-Party Plaintiffs,

          -against-

MITCHELL STEIN; and JOSEPH
FROHNHOEFER, III,

              Third-Party Defendants.
-----------------------------------X
```

MEMORANDUM & ORDER
20-CV-2877(JS)(SIL)

APPEARANCES

For Plaintiff:                Mitchell A. Stein, Esq.
                              Stein Law, P.C.
                              24 Woodbine Avenue, Suite 4
                              Northport, New York  11768


For Defendants
Tampa Bay Marine Recovery
Inc., Erich A. Jaeger &
Abigail Jaeger:               John Alexander Karol, Esq.
                              Richard L. Rosen, Esq.
                              The Richard L. Rosen Law Firm, PLLC
                              110 East 59th Street, 23rd Floor
                              New York, New York  10022

                                 Sarah Gogal Passeri, Esq.
                                 Holland & Knight LLP
                                 31 West 52nd Street
                                 New York, New York  10019

Kathleen Moreno &
Raul Moreno:                     Jason H. Baruch, Esq.
                                 Noel Boeke, Esq.
                                 Paul Punzone, Esq.
                                 Sarah Gogal Passeri, Esq.
                                 Holland & Knight LLP
                                 100 North Tampa Street, Suite 4100
                                 Tampa, Florida  33602

SEYBERT, District Judge:

       This action arises out of the breakdown of the parties' franchise relationship.  Currently pending before the Court are (1) Defendants' respective motions to dismiss Plaintiff's Second Amended Complaint; and (2) Plaintiff's motion for judgment on the pleadings on the Jaeger Defendants' Third-Party Complaint.

       For the reasons that follow, Defendants' respective motions to dismiss (ECF Nos. 172, 176) are GRANTED in part and DENIED in part; and Plaintiff's motion for judgment on the pleadings (ECF No. 192) is GRANTED in part and DENIED in part.

FACTUAL BACKGROUND[1]

I.   The Parties

　　　　Plaintiff and Counter-Defendant Sea Tow International, Inc. ("Plaintiff" or "Sea Tow") is an international marine assistance provider and licensor that provides assistance to boaters on the water, including mechanical assistance, towage and salvage, and other services on a member and non-member basis. (Second Amended Complaint ("SAC") ¶ 28, ECF No. 141.)  Sea Tow operates through its franchise program of the Sea Tow Proprietary Properties, "including the famous 'Sea Tow' Trademarks, Sea Tow Copyrights, and Sea Tow Know How." (Id.)  Third-Party Defendants Mitchell Stein ("Stein") and Captain Joseph Frohnhoefer III ("Frohnhoefer") are Sea Tow's General Counsel and Chief Executive Officer, respectively. (Third-Party Complaint ("TPC") ¶¶ 8-9, ECF No. 62.)

　　　　Defendant Tampa Bay Marine Towing & Services ("TBM-Towing") is a Florida corporation owned and operated by Defendants Kathleen and Raul Moreno (the "Morenos" and together with TBM-Towing, the "Moreno Defendants"). (SAC ¶¶ 22-23.)  The Morenos also own and operate Defendant Preferred Brands, Inc. ("Preferred Brands"), a liquor and wine distributor. (Id. ¶¶ 24, 113-14.)

---

[1] The facts alleged in support of Plaintiff's claims are drawn from Plaintiff's Second Amended Complaint.  The facts alleged in support of the Jaeger Defendants' claims and counterclaims are drawn from their Third-Party Complaint and Counterclaims.

Defendant Erich Jaeger ("E. Jaeger") is a licensed sea captain who, along with his wife and co-Defendant, Abigail Jaeger ("A. Jaeger"), owned and operated Tampa Bay Marine Recovery, Inc. ("TBM-Recovery" and together with the Jaegers, the "Jaeger Defendants"), a maritime towing and salvage business. (Id. ¶¶ 18-20.) Kathleen Moreno is E. Jaeger's mother. (Id. ¶ 21.)

II. The Franchise Agreement between Sea Tow and TBM-Towing

A. The Morenos Acquire TBM-Towing

On January 29, 2015, the Morenos entered into a Sales Agreement and Assignment with Eugene N. Shute IV ("Shute") for the purchase of 100% of the stock of TBM-Towing, which had been a Sea Tow franchise since 2002. (SAC ¶ 29.) The Morenos paid a portion of the purchase price for TBM-Towing -- totaling $857,500 -- by a promissory note given to the former owner, Shute, payable by TBM-Towing and the Morenos in the amount of $128,625 (the "Shute Note"). (Id. ¶¶ 30, 47.) The Morenos also secured three separate loans from Synovus Bank to finance the acquisition of TBM-Towing and provide working capital for their investment (the "Synovus Loans"). (Id. ¶ 59.) Sea Tow alleges Preferred Brands guaranteed two of the three Synovus Loans. (Id. ¶ 60.) According to Sea Tow, the funds for the deposit required by the Sales Agreement were paid by Preferred Brands. (Id. ¶ 30.)

Sea Tow further alleges that, unbeknownst to Sea Tow, the Morenos and Shute entered into a consulting agreement pursuant

to which the Morenos paid Shute $69,360.  (<u>Id.</u> ¶ 30.)  According
to Sea Tow, the consulting agreement did not obligate Shute to
work a minimum number of hours or maintain a presence at TBM-
Towing's business location to earn the consulting fee and was
simply an effort to "disguise an addition to the purchase price of
TBMT," since Sea Tow was entitled to receive from the Morenos an
amount equal to three percent of the purchase price of TBM-Towing.
(<u>Id.</u> ¶¶ 30-31.)

   B.   <u>The Franchise Agreement</u>

      On April 23, 2015, Sea Tow and TBM-Towing signed the
then-current version of the Franchise Agreement for the continued
operation of the Sea Tow franchise known as "Sea Tow Tampa Bay"
with an exclusive area of responsibility ("AOR") defined as a
specific portion of Tampa Bay, Florida.  (<u>Id.</u> ¶ 32.)  Several
provisions in the Franchise Agreement are relevant to the present
lawsuit.  First, pursuant to Section 9.18, the Morenos were
required to personally guarantee TBM-Towing's obligations under
the Franchise Agreement.  (<u>Id.</u> ¶ 33.)  To that end, the Morenos
executed a Guaranty pursuant to which they agreed to "jointly and
severally unconditionally guarantee the full, prompt and complete
performance of [TBM-Towing] under the terms, covenants and
conditions of the [Franchise] Agreement."  (<u>Id.</u> ¶ 34.)

      Next are the provisions providing for default under the
Franchise Agreement.  In particular, under Section 16.1, a

franchisee is deemed in default "if a suit to foreclose any lien or mortgage against Franchisee or the Sea Tow Franchised Business" in an amount greater than $25,000 "is not dismissed within thirty (30) days from the date such suit is instituted." (Id. ¶ 38.)  In the event Section 16.1, hereafter referred to as the Termination Clause, is triggered, the Franchise Agreement and any rights thereunder terminate automatically. (Id.)

Next are the provisions of the Franchise Agreement regarding payment of Membership Fees.  Under the Franchise Agreement, customers pay annual fees to be members of Sea Tow and to receive covered services from Sea Tow franchisees. (Id. ¶ 36.) The Membership Fees are paid to Sea Tow, divided by Sea Tow, and paid to the appropriate franchisee pursuant to a confidential formula. (Id.)  Under Section 8.7 of the Franchise Agreement, those Membership Fees paid to the franchisee "belong to the Franchisee." (Franchise Agreement § 8.7, ECF No. 191-1.)  Three other provisions, Sections 5.8, 16.2.19, and 17.11, address the scenario where a Sea Tow member pays its Membership Fees directly to the franchisee, rather than Sea Tow, thus obligating the franchisee to hold those Fees in trust before immediately reimbursing Sea Tow its pro rata share. (SAC ¶ 39.)

Last are the provisions addressing the use of confidential information, referred to in the Franchise Agreement as "Sea Tow Know How". (Id. ¶¶ 40-41.)  Article 13 of the Franchise

Agreement imposes on franchisees a non-disclosure obligation that prohibits the disclosure of Sea Tow Know How. (Id.) The Morenos and the Jaegers, who at that time were employed by TBM-Towing, executed Non-Competition and Non-Disclosure Agreements ("NCNDAs") attached as Exhibit D to the Franchise Agreement. (Id. ¶ 43.) The NCNDAs also prohibit the disclosure of Sea Tow Know How and require that any such information be returned to Sea Tow upon the termination of the Franchise Agreement. (Id. ¶¶ 43-44.)

III. The Shute Action

Sometime in 2017, the Morenos and TBM-Towing defaulted on the Shute Note, prompting Shute to file a lawsuit to collect on it (the "Shute Action"). (Id. ¶ 48.) To resolve the Shute Action, TBM-Towing and the Morenos entered into a new promissory note (the "New Shute Note"), pursuant to which Shute agreed to take a haircut. (Id.) Sea Tow guaranteed the performance of TBM-Towing and the Morenos under the New Shute Note, and in the event the Moreno Defendants failed to make payments thereunder, the New Shute Note permitted Sea Tow to "offset and deduct" from TBM-Towing's Membership Fees any amounts it paid Shute to cure the default. (Id.; see also New Shute Note, Ex. 2, attached to Moreno Decl., ECF No. 57-2.)

Sea Tow alleges K. Moreno made several misrepresentations to induce Sea Tow to provide assistance in the Shute Action and guarantee the New Shute Note. (SAC ¶¶ 49-55.)

Specifically, Sea Tow alleges K. Moreno misrepresented TBM-Towing's available defenses to the Shute Action. (Id. ¶¶ 49-50.) Sea Tow further alleges K. Moreno misrepresented that TBM-Towing was current on its obligations and failed to disclose that TBM-Towing had defaulted on the Synovus Loans, discussed infra, in order to induce Sea Tow to guarantee the New Shute Note. (Id. ¶¶ 51-54.) Sea Tow has been making payments on the New Shute Note since December 2019, paying a total sum of $50,612.18 as of February 26, 2021. (Id. ¶¶ 57-58.)

IV.   The Synovus Action

As noted above, the Morenos financed part of their purchase of TBM-Towing through the Synovus Loans, one of which was secured by a lien on TBM-Towing's assets. (Id. ¶ 59.) Preferred Brands guaranteed two of the Synovus Loans. (Id. ¶ 60.)

However, on February 5, 2019, Synovus provided notice to TBM-Towing and the Morenos that they had defaulted under the Synovus Loans. (Id. ¶ 61.) Synovus advised that it intended to initiate a collection action and foreclose its liens (id.), which it did on April 10, 2019, filing a complaint against TBM-Towing and the Morenos in Florida State Court (the "Synovus Action") (id. ¶ 62). Sea Tow alleges TBM-Towing was required to provide notice of the Synovus Action to Sea Tow under Section 12.3 of the Franchise Agreement. (Id. ¶ 63) TBM-Towing did not notify Sea Tow of the Synovus Action, however; nor did it have the action

dismissed within thirty days from its commencement.  (Id. ¶ 64.)
The Synovus Action remains pending.  (Id.)

In September 2019, Sea Tow independently learned of the
Synovus Action.  Because the action had been pending for more than
30 days, Sea Tow acted on its belief that, pursuant to the
Termination Clause, the Franchise Agreement had terminated as of
May 11, 2019, and notified TBM-Towing as much.  (Id. ¶¶ 65-66.)
Sea Tow accordingly ceased remitting TBM-Towing's portion of the
Membership Fees.  (Id. ¶ 66.)

V.   Sea Tow Engages the Jaeger Defendants

A.   The Management Agreement with TBM-Recovery

On October 31, 2019, Sea Tow, TBM-Towing, and the Morenos
executed a "Termination and Relinquishment Agreement" (the
"TARA").  (Id. ¶ 67.)  Under the TARA, TBM-Towing acknowledged the
termination of the Franchise Agreement and that it was required to
return certain unearned Membership Fees paid to it by Sea Tow, an
amount totaling $562,637.87.  (Id. ¶¶ 67-68.)  The Moreno
Defendants also reaffirmed their non-disclosure and non-
competition commitments.  (Id. ¶ 69.)  In exchange, Sea Tow agreed
to forego taking action against the Moreno Defendants.  (TARA ¶ 2,
ECF No. 191-2.)[2]

---

[2] The TARA is currently filed under seal pending the Court's
resolution of Sea Tow's outstanding appeal of Magistrate Judge
Locke's Order denying Sea Tow's request to file the TARA and other

Pursuant to the TARA, and at the Moreno's request, Sea Tow appointed E. Jaeger and TBM-Recovery as managers of the Tampa Bay AOR pursuant to a Manager Delegation Agreement (the "Management Agreement"). (Id. ¶¶ 72-73, 75.) Pursuant to the Management Agreement, TBM-Recovery agreed to operate under the structure of the Franchise Agreement. (Id. ¶ 77.) Indeed, TBM-Recovery entered into a lease agreement with TBM-Towing pursuant to which TBM-Recovery leased TBM-Towing's boats and other personal property used in the Sea Tow Tampa Bay franchise. (Id. ¶ 82.) With respect to payment terms, TBM-Recovery agreed to pay to Sea Tow 15% of the gross revenue generated by the Tampa Bay AOR. (Id. ¶ 78.) The Management Agreement further obligated TBM-Recovery to pay $25,000 for costs incurred in the creation of the Management Agreement; to that end, TBM-Recovery and E. Jaeger executed a Promissory Note in the original principal amount of $25,000. (Id. ¶ 80.) For its part, Sea Tow advanced $35,952.48 in Membership Fees under the Management Agreement. (Id. ¶ 81.) The Management Agreement also provided TBM-Recovery an option to purchase the Sea Tow Tampa Bay franchise, allegedly at a substantial discount to what Sea Tow could have sold the franchise for on the open market. (Id. ¶ 76.)

---

documents under seal. Having prioritized merits adjudication, the Court will address Sea Tow's appeal forthwith.

B.    Sea Tow's Alleged Misrepresentations

In the Third-Party Complaint, the Jaeger Defendants allege Stein and Frohnhoefer, acting on behalf of Sea Tow, made several misrepresentations regarding the legal effects of the TARA and TBM-Recovery's earning potential.  (TPC ¶¶ 29-50.)  In essence, the Jaeger Defendants allege Frohnhoefer and Stein "materially and willfully concealed from the Jaegers the fact that the proposed transaction was a 'franchise agreement' under both New York and Florida state law."  (Id. ¶ 29.)  The Jaegers also claim that Frohnhoefer and Stein misrepresented TBM-Recovery's earning potential by suggesting "the Jaegers would be able to earn revenues on par with the revenues earned by TBMT during its prior year of operation."  (Id. ¶ 34.)

The foregoing allegations are relevant to the Jaeger Defendants' claims arising under the New York Franchise Sales Act ("NYFSA") and Florida State Law.  The Jaeger Defendants contend that the Management Agreement is, in fact, a franchise agreement, thereby triggering obligations on the part of Sea Tow under the NYFSA and the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").  These obligations are described further below.

VI.  TBM-Towing Files for Bankruptcy

On February 19, 2020, TBM-Towing filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Case").  (SAC ¶ 87.)

Essentially, Sea Tow alleges TBM-Towing and the Morenos used the Bankruptcy Case to "regain the terminated Franchise Agreement." (Id. ¶ 89.)  To that supposed end, on April 22, 2020, TBM-Towing filed a motion in the Bankruptcy Case requesting the Bankruptcy Court order Sea Tow to turn over the terminated Franchise Agreement and Membership Fees to TBM-Towing.  (Id. ¶ 88.)  The Bankruptcy Court denied TBM-Towing's request on June 22, 2020.  (Id. ¶ 90.)

Shortly thereafter, TBM-Towing filed an adversary complaint against Sea Tow in the Bankruptcy Case.  (Id. ¶ 91.) TBM-Towing sought a declaration of its rights in the terminated Franchise Agreement, turnover of the Franchise Agreement, and damages.  (Id.)  While Sea Tow's motion to dismiss the adversary proceeding did not succeed, its subsequent motion to dismiss the Bankruptcy Case did, resulting in dismissal of the Bankruptcy Case and adversary proceeding on December 4, 2020.  (Id. ¶¶ 92-94.)

VII. Alleged Violations of the NCNDAs and Trademark Infringement

Sea Tow alleges Defendants wrongfully disclosed Sea Tow's confidential financial information in the Bankruptcy Case. (Id. ¶¶ 95-103.)  With respect to the Jaegers, Sea Tow asserts that they provided the bankruptcy trustee and TBM-Towing's bankruptcy counsel with Sea Tow Know How for the Sea Tow Tampa Bay franchise in contravention of Sea Tow's instruction.  (Id. ¶¶ 95-96.)  According to the Jaegers, they did not disclose any proprietary or confidential Sea Tow Know How, and in any event,

any such disclosure of these materials was permitted under the Management Agreement.  (TPC ¶¶ 96-98.)

With respect to the Moreno Defendants, Sea Tow asserts they violated their non-disclosure obligations by providing financial information constituting Sea Tow Know How, including royalty remittance reports, profit and loss statements, a copy of the Franchise Agreement, and a copy of the TARA, to TBM-Towing's bankruptcy attorney.  (SAC ¶¶ 97-99.)  Sea Tow further alleges the Moreno Defendants filed in the Bankruptcy Case documents containing photographs of boats bearing Sea Tow Trademarks.  (Id. ¶ 100.)

VIII.   Termination of the Management Agreement

On June 26, 2020, Sea Tow terminated the Management Agreement with TBM-Recovery and E. Jaeger based on their alleged breach of the Management and Franchise Agreements.  (Id. ¶¶ 104-06.)  As far as the Court can discern, Sea Tow contends the Jaeger Defendants breached the Management Agreement by furnishing the bankruptcy trustee and bankruptcy counsel with the above-mentioned materials, and by ceasing communications with Sea Tow.  (Id.)  The termination triggered certain post-termination protocol, including ceasing and desisting from further use of Sea Tow's trademarks, which Plaintiff alleges the Jaeger Defendants have refused to follow.  (Id. ¶ 107.)  Moreover, Plaintiff alleges TBM-Recovery has stopped paying Sea Tow its 15% share of the franchisee's

monthly gross revenue and has stopped making payments under the Promissory Note.  (Id. ¶¶ 108-09.)  According to Sea Tow, at some uncertain time, TBM-Recovery accepted Sea Tow Membership Fees from two members without remitting Sea Tow's portion in violation of the Franchise Agreement.  (Id. ¶¶ 110-11.)

For their part, the Jaeger Defendants allege Sea Tow breached the Management Agreement.  The Jaeger Defendants assert that Sea Tow demanded payments required under the terms of the Franchise Agreement, but not the Management Agreement.  (TPC ¶¶ 68-69.)  Further, the Jaeger Defendants allege that when the Moreno Defendants defaulted on the New Shute Note, Sea Tow deducted the monthly loan amount due and owing on the Note from the monthly revenues earned by and owing to TBM-Recovery for a total amount of $23,462.60.  (Id. ¶¶ 72-74.)

IX.  Allegations regarding Preferred Brands

As noted supra, Preferred Brands is a liquor and wine distributor owned by the Morenos, who serve as president and vice-president of the company.  (Id. ¶¶ 113-14.)  Plaintiff's allegations regarding Preferred Brands relate to certain transfers the Morenos are alleged to have facilitated between TBM-Towing and Preferred Brands.  For example, Plaintiff alleges that between May 2016 and February 2020, TBM-Towing transferred no less than $107,000 to Preferred Brands from TBM-Towing's operating account. (Id. ¶ 115.)  Sea Tow alleges "TBMT and Preferred Brands shuttled

their funds in and out of their respective bank accounts to the
other's without regard to each corporation's form or separate
existence." (Id. ¶ 117.)  Given the lack of documentation and
commingling, Sea Tow argues TBM-Towing was a mere instrumentality
of Preferred Brands. (Id. ¶ 118.)  Moreover, Sea Tow alleges the
Morenos transferred no less than $41,000 from TBM-Towing's
operating account to their personal accounts. (Id. ¶ 119.)  The
Morenos also used the debit card for TBM-Towing's operating account
"to make multiple purchases and ATM withdrawals at various casinos
around the country." (Id. ¶ 121.)

<u>PROCEDURAL HISTORY</u>

On June 29, 2020, Sea Tow initiated this action against
the Moreno and Jaeger Defendants.  Sea Tow alleges three counts
against the Moreno Defendants for (1) fraud, (2) breach of the
Guaranty, and (3) breach of the implied covenant of good faith and
fair dealing. (Compl. ECF No. 1.)  On July 8, 2020, the parties
stipulated to a preliminary injunction prohibiting the Jaeger
Defendants' from using Sea Tow's trademarks and trade dress. (ECF
No. 25.)  On September 4, 2020, the Moreno Defendants filed a
motion to stay these proceedings pending the Bankruptcy Case, but
Magistrate Judge Locke denied the motion shortly after the
Bankruptcy Case was dismissed. (Min. Entry, ECF No. 46.)[3]

---

[3] After the Bankruptcy Case was dismissed, TBM-Towing moved to
intervene, which request this Court granted. (ECF No. 75.)

Accordingly, Defendants sought leave to file their motions to dismiss Sea Tow's Complaint, which motions were mooted by Sea Tow's filing of an Amended Complaint as of right. (See Am. Compl., ECF No. 73.)  However, the Jaeger Defendants' Third-Party Complaint and Counterclaims remained operative.[4]

In response to Defendants' respective requests to file motions to dismiss Plaintiff's Amended Complaint, Plaintiff sought leave to file a second amended complaint, which request was granted in part and denied in part by Magistrate Judge Locke. (Order, ECF No. 137.)  Plaintiff filed its Second Amended Complaint (ECF No. 141), and the instant motions to dismiss followed (Moreno Defs. Mot., ECF No. 172; Jaeger Defs. Mot., ECF No. 176; see also Moreno Defs. Support Memo, ECF No. 173; Jaeger Defs. Support Memo, ECF No. 177; Sea Tow Opp'n, ECF No. 189).  Further, after answering the Third-Party Complaint and Counterclaims (ECF No. 174), Plaintiff filed a motion for judgment on the pleadings on the claims raised in the Jaeger Defendant's Third-Party Complaint (Sea Tow. Mot., ECF No. 192; see also Jaegers Defs. Opp'n, ECF No. 197).

In the operative Second Amended Complaint, Plaintiff alleges the following causes of action: (1) fraud and conspiracy to defraud against all Defendants; (2) trademark infringement and

---

[4] The Court clarified its understanding of Sea Tow's obligations to respond to the Third-Party Complaint and Counterclaims at its November 12, 2021 pre-motion conference.  (See ECF No. 168.)

dilution, seeking both injunctive and compensatory relief, against all Defendants except A. Jaeger; (3) breach of the Franchise Agreement, Management Agreement, TARA, and NCNDAs against all Defendants; (4) breach of the Promissory Note and Guarantee against TBM-Recovery and E. Jaeger; (5) breach of the Guaranty against the Morenos; (6) replevin of trade secrets against all Defendants; (7) unfair competition, deceptive trade practices, false advertising under New York General Business Law ("NY GBL") Sections 349 and 350-A against all Defendants; and (8) constructive trust against the Morenos and Preferred Brands.

In their Third-Party Complaint and Counterclaims, the Jaeger Defendants raise the following causes of action: (1) violations of the NYFSA; (2) violations of the FDUPTA and the Florida Business Opportunities Act; (3) breach of contract and the implied covenant of good faith against Sea Tow and Frohnhoefer; (4) unjust enrichment against Sea Tow; (5) unfair competition against Sea Tow; (6) tortious interference with contract against Sea Tow; (7) and other declaratory relief.

<u>DISCUSSION</u>

I.  <u>Legal Standard</u>

In deciding a Rule 12(b)(6) motion to dismiss, the Court applies a "plausibility standard," which is guided by "[t]wo working principles." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009) (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544 (2007)); <u>accord</u>

Harris v. Mills, 572 F.3d 66, 71–72 (2d Cir. 2009).  First, although the Court must accept all allegations as true, this "tenet" is "inapplicable to legal conclusions"; thus, "[t]hreadbare recitals of the elements of a cause of action supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678; accord Harris, 572 F.3d at 72.  Second, only complaints that state a "plausible claim for relief" can survive a Rule 12(b)(6) motion to dismiss.  Iqbal, 556 U.S. at 679. Determining whether a complaint does so is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.; accord Harris, 572 F.3d at 72.

"The standard for granting a Rule 12(c) motion for judgment on the pleadings is identical to that for granting a Rule 12(b)(6) motion for failure to state a claim." Lively v. WAFRA Inv. Advisory Grp., Inc., 6 F.4th 293, 301 (2d Cir. 2021) (Lynch v. City of New York, 952 F.3d 67, 75 (2d Cir. 2020) (cleaned up)). "[J]udgment on the pleadings is not appropriate if there are issues of fact which if proved would defeat recovery, even if the trial court is convinced that the party opposing the motion is unlikely to prevail at trial." Id. (quoting Dist. No. 1, Pac. Coast Dist., Marine Eng'rs Beneficial Ass'n v. Liberty Mar. Corp., 933 F.3d 751, 761 (D.C. Cir. 2019) (internal quotation marks omitted)).

II.  <u>Analysis</u>

To begin, the Court analyzes Sea Tow's fraud claims arising out of alleged misrepresentations made throughout their dealings with Defendants and TBM-Towing's Bankruptcy Case.  Next, the Court addresses the Jaeger Defendants' allegations regarding Sea Tow's alleged non-compliance with the New York Franchise Sales Act.  The Court then turns to the breach of contract claims arising out of the web of contractual agreements at issue.  Last, the Court analyzes the parties' remaining disputes arising under the Lanham Act, NY GBL, and Florida State Law.

A.  <u>Sea Tow's Fraud and Conspiracy to Defraud Claim</u>

Sea Tow's fraud claim arises from (1) alleged misrepresentations made by the Moreno Defendants, in particular K. Moreno, in connection with various agreements the parties entered into for the Tampa Bay AOR franchise, and (2) the alleged conspiracy to "misappropriate the Tampa Bay franchise" through TBM-Towing's Bankruptcy Case.  (SAC ¶¶ 131-144.)  While Plaintiff can proceed with its fraud claim based on the Moreno Defendants' alleged misrepresentations, the Court finds that Plaintiff fails to adequately plead a fraud claim based on TBM-Towing's Bankruptcy Case.

"To prove common law fraud under New York law, a plaintiff must show that (1) the defendant made a material false representation, (2) the defendant intended to defraud the

plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank, 57 F.3d 146, 153 (2d Cir. 1995) (citations omitted); Ambac Assurance Corp. v. Countrywide Home Loans, Inc., 106 N.E.3d 1176, 1182 (N.Y. 2018) ("The required elements of a common-law fraud claim are 'a misrepresentation or a material omission of fact which was false and known to be false by [the] defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury.'" (citation omitted)). "In all averments of fraud . . . the circumstances constituting fraud . . . shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b).

In the present case, Plaintiff plausibly alleges a fraud claim based on the Moreno Defendants' alleged misrepresentations. In its Second Amended Complaint, Plaintiff alleges the Moreno Defendants, in particular K. Moreno, made several misrepresentations to Sea Tow regarding TBM-Towing's solvency to induce Sea Tow to provide assistance in the Shute Action and to later guarantee the New Shute Note. Plaintiff plausibly alleges that it relied on these representations and was injured as a result, including by having to make payments under the New Shute

Note.  Contrary to the Jaeger Defendants' arguments, the Court finds that Plaintiff has alleged the circumstances constituting fraud with particularity -- Plaintiff has specified the statements and omissions that give rise to its claim for fraud, who made them and when, and has articulated why they were fraudulent.  At this juncture, nothing more is required.

Plaintiff further alleges that the Morenos concealed material facts regarding the original purchase of TBM-Towing -- namely, the "consulting agreement" with Shute -- in order to "disguise" an addition to the purchase price and thereby cheat Sea Tow out of proceeds from the sale.  "Where a plaintiff seeks to show fraud by omission," as is the case here, "it must also prove that the defendant had a duty to disclose the concealed fact." W. Valley KB Venture, LLC v. ILKB LLC, No. 20-CV-3278, 2021 WL 4171918, at *7 (E.D.N.Y. Sept. 13, 2021) (Seybert, J.).  Here, Sea Tow plausibly alleges that the Morenos had "superior knowledge of essential facts" regarding the purchase of the franchise that rendered the transaction without disclosure unfair, thus triggering an obligation to disclose the consulting agreement, which allegedly deprived Sea Tow of proceeds from the sale. See Swersky v. Dreyer & Traub, 643 N.Y.S.2d 33, 37 (N.Y. App. Div. 1st Dep't 1996).

However, the Court agrees with Defendants that Sea Tow's fraud claims cannot proceed to the extent they are premised on an

alleged "conspiracy" with respect to TBM-Towing's Bankruptcy Case. As an initial matter, Sea Tow's allegation that Defendants "direct[ed] TBMT to file a [B]ankruptcy [C]ase in order to attempt to reinstate the terminated [F]ranchise [A]greement," (SAC ¶ 8), is conclusory in that it fails to specify which Defendants were conspirators or any "overt act" taken in furtherance of the supposedly unlawful objective.  See Stutts v. De Dietrich Grp., No. 03-CV-4058, 2006 WL 1867060, at *14 (E.D.N.Y. June 30, 2006) ("Conspiracy claims premised upon 'conclusory, vague or general' allegations will not withstand a motion to dismiss." (citing Boddie v. Schneider, 105 F.3d 857, 862 (2d Cir. 1997))).

Indeed, even setting aside these pleading deficiencies, the Court doubts that Sea Tow could demonstrate this "scheme" had an "unlawful objective," as required to make out a cause of action for conspiracy to defraud, because filing for bankruptcy is a lawful, statutorily prescribed right to which distressed debtors are entitled to avail themselves.  Callahan v. Gutowski, 488 N.Y.S.2d 519, 521 (N.Y. App. Div. 3rd Dep't 1985) ("A lawful act done in a lawful way, no matter how damaging the result, cannot be the basis for a claim of fraudulent conspiracy, even if it was performed maliciously.").  It is telling that Sea Tow cites to no case sustaining the type of fraud-based allegations it seeks to pursue, and the lone case cited in its brief is distinguishable, involving as it did a dispute over a sanctions award in a

bankruptcy case.   See Matter of Omega Tr., 120 B.R. 265, 270 (S.D.N.Y. 1990).

Accordingly, Defendants' motion to dismiss Sea Tow's fraud and conspiracy to defraud claim is GRANTED in part and DENIED in part.   Because there are no plausible allegations the Jaeger Defendants made misrepresentations in connection with the parties' dealings, the fraud claim against them is DISMISSED.

B.   The NYFSA Counterclaims

The Jaeger Defendants assert claims arising under the New York Franchise Sales Act ("NYFSA") that may be categorized as (1) registration-based violations; (2) disclosure-based violations; and (3) fraud-based violations.   Because many of Defendants' defenses to Sea Tow's breach of contract actions are premised on Sea Tow's alleged non-compliance with the NYFSA, the Court addresses its application here first.

1.   The NYFSA's Legal Framework

The New York Legislature enacted the NYFSA "to combat abuses that had accompanied the growth of the franchising industry and had resulted in substantial losses to New York residents." A.J. Temple Marble & Tile, Inc. v. Union Carbide Marble Care, Inc., 87 N.Y.2d 574, 579 (N.Y. 1996).   To that end, the NYFSA contains "comprehensive disclosure and registration requirements and an expansive antifraud provision," violation of which gives rise to

civil liability.  Id. (citing NY GBL § 691).  Courts must liberally construe the NYFSA.  NY GBL § 695(2).

The NYFSA applies to offers or solicitations to sell a "franchise," which is defined as an agreement, "either expressed or implied," whereby

> (1) "[a] franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan or system prescribed in substantial part by a franchisor, and the franchisee is required to pay, directly or indirectly, a franchise fee," or
>
> (2) "[a] franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate, and the franchisee is required to pay, directly or indirectly, a franchise fee."

NY GBL § 681(3)(a)-(b).  Both types of franchise arrangements require payment of a "franchise fee," which the NYFSA defines as "any fee or charge that a franchisee or subfranchisor is required to pay or agrees to pay directly or indirectly for the right to enter into a business under a franchise agreement or otherwise sell, resell or distribute goods, services, or franchises under such an agreement, including, but not limited to, any such payment for goods or services," id. § 681(7), except that "payment of a fee which on an annual basis does not exceed five hundred dollars

24

where the payor receives sales materials of an equivalent or greater value than his payment" does not constitute a franchise fee, id. § 681(7)(e).

With respect to a franchisor's registration and disclosure obligations, NYFSA Section 683 prohibits the sale of franchises in New York unless the franchisor has registered with the Attorney General's Office an "offering prospectus" containing certain statutorily enumerated disclosures. Burgers Bar Five Towns, LLC v. Burger Holdings Corp., 897 N.Y.S.2d 502 (N.Y. App. Div. 2nd Dep't 2010) (citing NY GBL § 683(1)); A Love of Food I, LLC v. Maoz Vegetarian USA, Inc., 70 F. Supp. 3d 376, 406 (D.D.C. 2014) (Jackson, J.).  However, the so-called "isolated sales exemption" exempts a franchisor from the NYFSA's registration and disclosure obligations if "[t]he transaction is pursuant to an offer directed by the franchisor to not more than two persons" where "the franchisor does not grant the franchisee the right to offer franchises to others, a commission or other remuneration is not paid directly or indirectly for soliciting a prospective franchisee in this state, and the franchisor is domiciled" in New York.  NY GBL § 684(3)(c); see also Maoz Vegetarian, 70 F. Supp. 3d at 406 (discussing the isolated sales exemption).

With respect to the NYFSA's anti-fraud provisions, Section 687 prohibits franchisors from making "any untrue statement of a material fact or [omitting] to state a material

fact necessary in order to make the statements made . . . not misleading," NY GBL § 687(2)(b), or otherwise employing "any device, scheme, or artifice to defraud" when selling or offering to sell a franchise, id. § 687(2)(a). See also Emfore Corp. v. Blimpie Assocs., Ltd., 860 N.Y.S.2d 12 (N.Y. App. Div. 1st Dep't 2008) (applying NYFSA's anti-fraud provisions); Coraud LLC v. Kidville Franchise Co., LLC, 121 F. Supp. 3d 387, 393 (S.D.N.Y. 2015) (same); Governara v. 7-Eleven, Inc., No. 13-CV-6094, 2014 WL 4476534, at *4 (S.D.N.Y. Aug. 20, 2014) (same); Olivieri v. McDonald's Corp., 678 F. Supp. 996, 1000 (E.D.N.Y. 1988) (same); Mount Holly Kickboxing, LLC v. Franchoice, Inc., No. 19-CV-0300, 2021 WL 1117968, at *14 (D. Minn. Mar. 24, 2021) (same); Maoz Vegetarian, 70 F. Supp. 3d at 413 (same).

Last, with respect to liability, Section 691 provides that "[a] person who offers or sells a franchise in violation" of Sections 683, 684, and 687, "is liable to the person purchasing the franchise for damages." NY GBL § 691(1); see also id. § 681(13) (defining a "person" to include "an individual" and "any other person that has a substantial interest in or effectively controls such person, as well as the individual officers . . . or other individuals in control of the activities of each such person"). "An individual may be found liable for a violation of the NYSFA in two ways": first, where a corporate officer, director, or controlling person of the franchisor personally commits a

statutory violation; and second, where a statutorily defined person affiliated with the franchisor "materials aids in the act or transaction constituting the violation." Coraud LLC, 121 F. Supp. 3d at 400 (citing NY GBL §§ 691(1), (3)). Violations of the NYFSA render the franchisor and individuals who meet the above requirements liable for damages and, in the event such violations are "willful and material, for rescission, with interest at six percent per year from the date of purchase, and reasonable attorney fees and court costs." NY GBL § 691(1).

2.   NYFSA's Application to the Management Agreement

First, the Court must address Sea Tow's arguments that the Management Agreement is not a franchise agreement within the meaning of the NYFSA. Sea Tow contends that it does not collect a franchise fee, placing it outside the ambit of the NYFSA. (Sea Tow Opp'n at 41-42; See Tow Mot. at 10-12.) The Court concludes otherwise based on the text of the NYFSA and its remedial purpose, the terms of the Management Agreement, including its fee arrangements and incorporation of the underlying Franchise Agreement structure, and Magistrate Judge Locke's reasoning in an earlier order.

To begin, the NYFSA's "definition of a franchise is among the broadest in the country." Nature's Plus Nordic A/S v. Nat. Organics, Inc., 980 F. Supp. 2d 400, 416 (E.D.N.Y. 2013) (quoting Aristacar Corp. v. Attorney General, 143 Misc.2d 551, 552 (N.Y.

Sup. Ct. 1989)).  As noted above, a franchise fee means "any fee or charge that a franchisee" is obligated to pay, "directly or indirectly," to the franchisor "for the right to enter into a business under a franchise agreement."  Relevant regulations further clarify that franchise payments can include periodic royalties.  See 13 N.Y.C.R.R. 200.1(a).  The Management Agreement's payment structure fits comfortably within the foregoing definition, especially given the Court's duty to "liberally construe" the NYFSA's provisions.  NY GBL § 695.  The Management Agreement obligates the Jaeger Defendants to pay 15% of their gross revenue to Sea Tow as well as Sea Tow's costs for drafting the Management Agreement.  These fees were paid for the right to enter into a business under a franchise agreement, because in exchange, Sea Tow (1) provided TBM-Recovery with a marketing plan or system prescribed by Sea Tow and (2) granted TBM-Recovery the rights to use Sea Tow's trademarks as part of its operations.[5]  The cases cited by Sea Tow do not compel a contrary conclusion, as the fee arrangements in those cases are distinguishable from those set forth in the Management Agreement.  See Kennedy v. Lomei, 570 N.Y.S.2d 338, 339 (N.Y. App. Div. 2nd Dep't 1991) (finding agreement to purchase bakery products did not involve payment of

---

[5] Because the Court finds this fee structure constitutes a franchise fee, Sea Tow's argument that its arrangement falls within the exception for franchise fees amounting to less than $500 annually fails.

a franchisee fee); <u>Nature's Plus Nordic A/S</u>, 980 F. Supp. 2d at
416 (finding advertising payment to be a distinct expenditure not
made "for the right to enter into" franchise business and,
therefore, not a franchise fee); <u>Carlucci v. Owens-Corning</u>
<u>Fiberglas Corp.</u>, 646 F. Supp. 1486, 1495 (E.D.N.Y. 1986) (finding
wholesale payment for shipment of goods not a franchise fee).

The Management Agreement's express terms further support
this conclusion, since it explicitly states that E. Jaeger and
TBM-Recovery must "operate under the [Franchise Agreement]" in the
Tampa Bay AOR.  Regardless whether the Management Agreement
completely incorporates by reference the Franchise Agreement, the
NYFSA provides that a franchise can arise through implicit
agreement, as is the case here.

To avoid the conclusion that the NYFSA applies to its
dealings with the Jaeger Defendants, Sea Tow relies on
correspondence between Sea Tow and the New York Attorney General's
Office in 1988.  As Magistrate Judge Locke summarized in an earlier
order denying a motion for a protective order:

> Sea Tow's communications with the NYAG in 1988
> and 1989 began because the NYAG sent Plaintiff
> a letter regarding its non-compliance with the
> NYFSA, subsequent to which Sea Tow entered
> into an Assurance of Discontinuance with the
> NYAG, refusing to admit non-compliance but
> agreeing to pay a fee and cease and desist
> from activities that could be considered
> violations of the law.  In 1989, Plaintiff
> wrote to the NYAG requesting an informal
> opinion that its proposed license agreement

> does not charge a franchise fee and therefore
> Sea Tow is exempt from the NYFSA.  The NYAG
> responded with an informal, non-binding
> opinion that the proposed agreement would not
> create a franchise relationship, but that such
> analysis "should not be considered an opinion
> either of this office or the undersigned."

(Order at 15-16, ECF No. 123 (citations to record omitted).)  The

Court agrees with Judge Locke that this correspondence is "hardly

sufficient to convince the Court" that the Management Agreement

and associated Franchise Agreement -- which may differ from the

proposed licensing agreement, not presently before the Court, that

Sea Tow submitted to the NYAG in 1989 -- are not covered by the

NYFSA.  (Id. at 16.)  Having obligated the Jaeger Defendants to

operate under the structure of the Franchise Agreement through the

separately executed Management Agreement, Sea Tow cannot now claim

the NYFSA does not apply to that agreement.[6]

### 3.  Registration- and Disclosure-Based Claims

Because the Court finds the Jaeger Defendants have

plausibly alleged the Management Agreement is a franchise within

the meaning of the NYFSA, the Court must consider the Jaeger

Defendants' claim that Sea Tow failed to properly register and

---

[6] Sea Tow does not argue that since the NYFSA "charges the Attorney-
General with the responsibilities of administering the
registration and amendment processes and of enforcing the
antifraud prohibitions," the letter correspondence is entitled to
some level of agency deference.  See Southland Corp. v. Abrams,
560 N.Y.S.2d 253, 255 (N.Y. Sup. Ct. 1990).  Accordingly, the Court
declines to consider this argument at this time.

disclose information as required by the Act.  In response, Sea Tow advances two arguments: (1) the isolated sales exemption exempts it from the NYFSA's registration and disclosure requirements; and, (2) even if that exemption does not apply, the Jaeger Defendants cannot plausibly allege that Sea Tow's failure to register or disclose was material or caused them any damages.  (Sea Tow Opp'n at 13-18.)

First, the isolated sales exemption does not apply here. This exemption was intended to be "interpreted narrowly," and "'does not mean that if a franchisor only sells franchises one at a time, and offers each such franchise to no more than two persons, it need never register' its offering prospectus." Maoz Vegetarian, 70 F. Supp. 3d at 408 (citing David J. Kaufmann's commentary on the NYFSA).  "Rather, the exemption should only apply when a franchisor 'limits itself to selling one franchise.'"  Id. (emphasis added).  Cursory review of the pleadings in this case makes clear that Sea Tow has not limited itself to selling a single franchise.  Sea Tow previously sold franchises to the Moreno Defendants and Shute and alleges that it is a "franchisor of the famous Sea Tow trademarks."  As a result, the isolated sales exemption does not exempt Sea Tow from the NYFSA's registration and disclosure requirements.

Next, Sea Tow argues that any registration and disclosure violations were not material to the Jaeger Defendants'

decision to purchase the franchise rights at issue. Sea Tow further contends that its alleged failure to register or disclose did not cause the Jaeger Defendants any damages. In support of these arguments, Sea Tow relies heavily upon Maoz Vegetarian, a decision from then-District Judge Ketanji Jackson that interpreted the NYFSA. As Judge Jackson rightly noted, money damages for a "technical registration violation" cannot be recovered absent proof that the violation caused the plaintiff damages. Maoz Vegetarian, 70 F. Supp. 3d at 408-09. Because the plaintiff in Maoz Vegetarian failed to identify evidence from the summary judgment record showing that the defendant's registration violation caused the plaintiff's business losses, Judge Jackson awarded the defendant summary judgment on that claim. However, unlike Maoz Vegetarian and the cases on which Judge Jackson relied,[7] all of which were decided on summary judgment, this case is at the pleading stage. The Jaeger Defendants have plausibly alleged that Sea Tow's failure to comply with the NYFSA's

_____

[7] BMW Co. v. Workbench, Inc., No. 86-CV-4200, 1988 WL 45594, at *2 (S.D.N.Y. Apr. 29, 1988) (granting summary judgment to defendant on the plaintiff-franchisee's disclosure claims because the plaintiff had not proven that the failure to disclose the offering prospectus caused its damages); Long John Silver's Inc. v. Nickleson, 923 F. Supp. 2d 1004, 1014 (W.D. Ky. 2013) (requiring the franchisee to show that the franchisor's failure to disclose the financial disclosure document caused it damages under analogous provisions of the Minnesota Franchise Act, but denying summary judgment in light of the "genuine issues of material fact as to causation and damages").

registration and disclosure violations caused them damages.  (See, e.g., TPC ¶¶ 160-61 (alleging that Sea Tow's failure to register and disclose a financial disclosure document, which would have included "information regarding initial investment costs" and "ongoing fees," caused the Jaeger Defendants to enter into the Management Agreement and harmed them as a result); see also TPC ¶¶ 150-51; 168; 172-73.)  While the evidence may not support such a conclusion in the final analysis, these well-pleaded allegations are sufficient at this juncture.

In any event, because the NYFSA authorizes rescission of the franchise agreement, in addition to damages, where the violation is willful and material, failure to allege damages would not result in dismissal of the registration- and disclosure-based claims, as the Jaeger Defendants would still be entitled to seek rescission of the agreement.  And while Sea Tow argues that it did not willfully violate the NYFSA, as it was acting on the aforementioned letter correspondence with the New York Attorney's General Office, such arguments are premature, as the issue of willfulness is "a question of fact not amenable to resolution on a motion to dismiss."  EV Scarsdale Corp. v. Engel & Voelkers N. E. LLC, 13 N.Y.S.3d 805, 814 (N.Y. Sup. Ct. 2015).

Accordingly, Sea Tow's motion for judgment on the pleadings on the Jaeger Defendants' NYFSA claims for registration and disclosure violations under Section 683 is DENIED.

4.   <u>Fraud-Based Claims</u>

In their Third-Party Complaint, the Jaeger Defendants essentially argue that Sea Tow defrauded them by failing to comply with the NYFSA's registration and disclosure requirements and making unidentified "material misrepresentations and/or omission regarding the circumstances of TBMT's [Franchise Agreement] termination." (TPC ¶ 177.) Sea Tow argues that these allegations are insufficient, and the Court agrees.

To begin, Sea Tow argues that Rule 9(b)'s heightened pleading requirements should apply to fraud claims under NYFSA Section 687. Sea Tow makes a related argument that common-law fraud requirements, such as reliance, must be sufficiently alleged to make out a fraud claim under the NYFSA. As the late-Honorable Judge Arthur D. Spatt observed, "there is no case law directly addressing whether claims brought under the NYFSA," including fraud-based claims under Section 687, "must comply with the heightened pleading standards of [Rule 9(b)]." <u>Schwartzco Enters. LLC v. TMH Mgmt., LLC</u>, 60 F. Supp. 3d 331, 357 (E.D.N.Y. 2014). Although Judge Spatt did not reach the issue in <u>Schwartzco</u>, he reasoned that Rule 9(b)'s application to the NYFSA was "likely not an 'all or nothing' answer," but rather provision-specific, with Rule 9(b) applying to claims brought under the NYFSA's anti-fraud provision but not its disclosure provision. <u>Id.</u> Moreover, there is a growing consensus that Section 687 claims, like common-law

fraud claims, must plead reliance.  <u>See</u> <u>Governara</u>, 2014 WL 4476534, at *4; <u>Emfore Corp.</u>, 860 N.Y.S.2d at 13; <u>Olivieri</u>, 678 F. Supp. at 1000; <u>Mount Holly Kickboxing</u>, 2021 WL 1117968, at *14; <u>Maoz Vegetarians</u>, 70 F. Supp. 3d at 413.  These cases conclude that to make out a claim under NYFSA Section 687, the plaintiff must plead that "(1) Defendant made an untrue or misleading statement of material fact, and that (2) Plaintiffs reasonably relied on that statement, (3) causing harm to Plaintiffs."  <u>E.g.</u>, <u>Governara</u>, 2014 WL 4476534, at *4.

The Court adopts Judge Spatt's suggestion and applies Rule 9(b)'s heightened pleading requirements to the fraud claim, which must also sufficiently allege reliance in accordance with the above caselaw.  With these requirements in mind, the Jaeger Defendants' fraud claim fails for several reasons.  First, the allegation that Sea Tow, through Stein and Frohnhoefer, misrepresented "the circumstances of TBMT's [Franchise Agreement] termination" is not alleged with particularity.  There are no facts articulating how this misrepresentation was fraudulent.  In fact, if Sea Tow is correct that the Franchise Agreement between it and the Moreno Defendants terminated, an issue addressed below, then their representations were likely accurate.  And in any event, the Jaeger Defendants cannot plausibly allege that they reasonably relied on Stein and Frohnhoefer's representations regarding the termination of the Franchise Agreement or how to characterize the

Management Agreement.  By their own admission, during negotiations with Sea Tow and its representatives, the Jaeger Defendants were represented by counsel, (TPC ¶¶ 39-41), who was positioned to advise his clients regarding the legal implications of the transaction.  See Mount Holly Kickboxing, LLC, 2021 WL 1117968, at *14 ("In assessing whether reliance on allegedly fraudulent misrepresentations is reasonable or justifiable, New York takes a contextual view, focusing on the level of sophistication of the parties, the relationship between them, and the information available at the time of the operative decision.").

The Jaeger Defendants also contend that Sea Tow's failure to register or disclose certain information as required under the NYFSA constitutes fraud.  This argument conflates the NYFSA's registration and disclosure provisions with the anti-fraud provision, thus violating the cardinal rule of statutory interpretation that "legislation is to be interpreted so as to give effect to every provision."  Majewski v. Broadalbin-Perth Cent. Sch. Dist., 696 N.E.2d 978, 982 (N.Y. 1998); see also Emfore Corp., 860 N.Y.S.2d at 13 (analyzing disclosure and fraud claims separately).  Reviewing other caselaw addressing the NYFSA makes clear that the Jaeger Defendants' fraud theory is untenable. Franchisees have alleged plausible fraud claims under the NYFSA based on misrepresentations regarding finances and profitability, Schwartzco Enters. LLC, 60 F. Supp. 3d at 340; Governara, 2014 WL

4476534, at *5; Emfore Corp., 860 N.Y.S.2d at 13, or the franchisor's training program, Olivieri, 678 F. Supp. at 1000. The Court recognizes that these examples do not delimit the types of fraud aggrieved franchisees can allege under the NYFSA, which defines fraud as "any device, scheme, or artifice to defraud." But the Court rejects the Jaeger Defendants' effort to bootstrap a fraud claim onto their registration and disclosure claims.

Accordingly, Sea Tow's motion for judgment on the pleadings on the Jaeger Defendants' NYFSA fraud claim arising under Section 687 is GRANTED.

### 5.   Individual Liability

Last, the Court finds the Jaeger Defendants have adequately pleaded individual liability against Stein and Frohnhoefer on their remaining NYFSA claims.  The NYFSA "directly imposes sanctions upon the personal commission of statutory violations by corporate officers, directors, and controlling persons." A.J. Temple Marble & Tile, 87 N.Y.2d at 582.  Stein, as Sea Tow's General Counsel, and Frohnhoefer, an Officer of Sea Tow, are each "persons" within the meaning of the NYFSA, and the allegations in the Third-Party Complaint extensively detail their direct participation in facilitating the Management Agreement with the Jaeger Defendants.  Id. at 584-85 (holding the franchisor's president who allegedly "directly participated in the unlawful

franchise sales" could be held jointly and severally liable for the NYFSA violations).

Accordingly, Sea Tow's motion for judgment on the pleadings on the Jaeger Defendants' NYFSA claims as alleged against Stein and Frohnhoefer is DENIED.

C.    Contractual Disputes

Next, the Court addresses Sea Tow's and the Jaeger Defendants' breach of contract claims.

Sea Tow alleges a bevy of contractual violations. First, Sea Tow alleges TBM-Towing violated provisions of the Franchise Agreement and the TARA by failing to remit the so-called "Unearned Membership Fees," and that E. Jaeger and TBM-Recovery violated the Management Agreement for the same reason. Second, Sea Tow alleges the Morenos breached their obligations under the Guaranty by failing to pay the TBM-Towing Unearned Membership Fees and the amounts Sea Tow has paid Shute pursuant to its guaranty of the New Shute Note. Third, Sea Tow alleges Defendants violated the Franchise Agreement and their respective NCNDAs, as well as their fiduciary duties to Sea Tow, by disclosing Sea Tow's confidential information and documents to the TBM-Towing bankruptcy trustee and bankruptcy counsel. Fourth, Sea Tow alleges TBM-Recovery and E. Jaeger violated the Franchise Agreement and Management Agreement by failing to cease and desist from further use of Sea Tow trademarks. Fifth, Sea Tow also alleges TBM-Recovery and E. Jaeger

violated the Management Agreement by failing to pay Sea Tow the
15% gross revenue due and owing thereunder for May and June 2020.
Finally, Sea Tow alleges that the Jaeger Defendants breached the
Promissory Note and related guarantee by failing to make payments
when due and by breaching the Management Agreement.

1.   Validity of the Termination Clause

The Moreno Defendants ask the Court to determine, as a
threshold matter, whether the Franchise Agreement's Termination
Clause is valid under New York law, reasoning that if the
Termination Clause is inoperable, then the Franchise Agreement did
not terminate and Plaintiff's breach of contract claims fail en
toto.   Essentially, the Moreno Defendants argue that the
Termination Clause is void under New York policy and the equitable
principles that govern franchise relationships, or, in the
alternative, is unconscionable and therefore unenforceable.
(Moreno Defs. Support Memo at 12.)   The Jaeger Defendants make
similar arguments.   (Jaeger Defs. Support Memo at 13-18.)   The
Court is not persuaded.

"As a general matter, when interpreting and enforcing
contracts, New York courts give effect to all contractual
provisions unless they offend public policy."   Modular Devices,
Inc. v. Alcatel Alenia Space Espana, No. 08-CV-1441, 2010 WL
3236779, at *4 (E.D.N.Y. 2010) (Seybert, J.).   The Moreno
Defendants ask the Court to "apply equitable principles to balance

39

the rights and obligations of franchisors and franchisees"
consistent with the NYFSA's concern for franchisors exercising
"unfettered and inequitable control over the relationship" with
their franchisees. (Moreno Defs. Support Memo at 10.)  In support
of their argument, the Moreno Defendants rely upon the late-
Honorable Judge Jack Weinstein's decision in LaGuardia Associates
v. Holiday Hospitality Franchising, Inc., 92. F. Supp. 2d 119
(E.D.N.Y. 2000), which involved a dispute between a pair of
franchisees -- two limited partnerships that owned hotels in the
vicinity of the major New York City airports -- and their
franchisor.  In the parties' course of performance under the
franchise agreements at issue in that case, the franchisor
regularly granted the franchisees a sixty-day grace period beyond
the payment schedule in the agreements. Id. at 122-23.  However,
after several years, the franchisor declined to extend the typical
grace period to the franchisees, causing the franchisees to fall
in arrears. Id. at 123.  Nevertheless, the franchisor did not
terminate the franchise agreements automatically, as those
agreements permitted, but instead granted the franchisees
extensions to cure their deficiency. Id.  At a certain point,
however, the franchisor declined to grant additional extensions
and removed the franchisees from the franchisor's reservation
system, prompting the franchisees to seek injunctive relief. Id.
Judge Weinstein concluded equitable considerations limited the

franchisor's authority to terminate the franchise agreement.  Id. at 130.  Acknowledging the NYFSA "does not by its express terms cover termination of franchises," Judge Weinstein nevertheless found that "its general tenor bespeaks a state policy to prevent overreaching in the franchise relationship."  Id. at 127.  In effect, Judge Weinstein leavened the strict termination clause found in the franchise agreement, finding the franchisor had waived its contractual right to enforce the franchise agreements' respective termination provisions.  Id. at 130.

The facts giving rise to Judge Weinstein's application of equitable principles to the franchisor-franchisee dispute in LaGuardia Associates differ from those in the present action.  In LaGuardia Associates, Judge Weinstein focused on the parties' course of performance under the franchise agreement and the franchisor's capricious enforcement of the agreement's payment terms, which resulted in a waiver.  But Defendants here do not take issue with the Sea Tow's application of the Termination Clause.  Rather, they challenge the Termination Clause itself, calling it "patently inequitable."  (Moreno Defs. Support Memo at 12.)  Yet LaGuardia Associates says nothing about exercising equitable principles to render inoperable a provision in a franchise agreement, and there are reasons to doubt that courts have freestanding equitable powers to modify the terms of a franchise agreement given New York's "'deeply rooted' public

41

policy" favoring the "enforcement of commercial contracts according to the terms adopted by the parties." 159 MP Corp. v. Redbridge Bedford, LLC, 128 N.E.3d 128, 132 (N.Y. 2019).

In fact, contrary to the Moreno Defendants' contention that Sea Tow's enforcement of the Termination Clause "reflects the franchisor overreach that the [NYFSA] seeks to prevent," (Moreno Defs. Support Memo at 12), the NYFSA "does not regulate the substantive terms of the offer or sale" of a franchise. Southland Corp. v. Abrams, 560 N.Y.S.2d 253, 256 (N.Y. Sup. Ct. 1990); see also TKO Fleet Enters., Inc. v. Elite Limousine Plus, Inc., 708 N.Y.S.2d 593, 596 (N.Y. Sup. Ct. 2000) (reasoning "inasmuch as the statute provides a remedy for aggrieved franchisees," it "is not intended to regulate the parties' actual contractual relationship"), aff'd, 729 N.Y.S.2d 193 (2001); LaGuardia Associates, 92 F. Supp. 2d at 126 (recognizing that the NYFSA regulates "only the formation of the franchise agreement" and does not "cover termination of franchises," even though other state franchise laws do "protect franchisees from arbitrary non-renewal or termination of the franchise"); Termination and Non-Renewal, 4E N.Y. Prac., Com. Litig. in New York State Courts § 123:15 (5th ed.).[8] Because the NYFSA "is not intended to regulate the parties' actual contractual relationship," TKO Fleet Enterprises, 708

---

[8] The lone exception to this rule is the prohibition against contractual waivers of rights under the NYFSA. NY GBL § 687(5).

N.Y.S.2d at 596, this Court cannot accept Defendants' argument that the "equitable principles that emanate from the NYFSA"[9] authorize it to excise the Termination Clause from the Franchise Agreement.  Id. at 596; see also Southland Corp., 560 N.Y.S.2d at 256.  Nor does the Termination Clause appear out of sync with the types of protections against insolvent franchisees that franchisors ordinarily secure through franchise agreements.  See Termination and Non-Renewal, 4E N.Y. Prac., Com. Litig. in New York State Courts § 123:15 (5th ed.) ("Generally, if a franchisee fails to meet its obligations under the agreement, fails to operate the business, files for bankruptcy, is subject to liens, or fails to meet government or operational requirements, then the franchisor has the right to terminate the agreement in accord with the provisions in the termination clause." (emphasis added)).

        Further, the Court is not persuaded the Termination Clause is unconscionable.  Generally, the party raising unconscionability must make "a showing that such a contract is both procedurally and substantially unconscionable."  Ragone v. Atl. Video at Manhattan Ctr., 595 F.3d 115, 121 (2d Cir. 2010) (citation omitted).  "The procedural element of unconscionability concerns the contract formation process and the alleged lack of meaningful choice," and typically is established by showing "high

---

[9] (Moreno Defs. Reply at 1.)

pressure commercial tactics, inequality of bargaining power, deceptive practices and language in the contract, and an imbalance in the understanding and acumen of the parties." Simar Holding Corp. v. GSC, 928 N.Y.S.2d 592, 595 (N.Y. App. Div. 2nd Dep't 2011). Here, the Moreno Defendants do not argue that the formation of the Franchise Agreement was procedurally unconscionable. Instead, they ask the Court to deem the Termination Clause unenforceable based on substantive unconscionability alone. (Moreno Defs. Support Memo at 15-16.)  While "there have been exceptional cases where a provision of the contract is so outrageous as to warrant holding it unenforceable on the ground of substantive unconscionability alone," Gillman v. Chase Manhattan Bank, N.A., 534 N.E.2d 824, 829 (N.Y. 1988), for the reasons stated above, the Termination Clause at issue does not fall within this exceptional category.

### 2. The Unearned Membership Fees

Having rejected Defendants' threshold challenge to the Termination Clause, the Court turns to the parties' dispute over allegedly "unearned" Membership Fees that Sea Tow remitted to the Moreno Defendants under the Franchise Agreement and which Sea Tow now seeks to claw back.  Based on its construction of the Franchise Agreement's payment terms, the Court finds that Sea Tow is not entitled to these Membership Fees under the Franchise Agreement's plain terms.  Nevertheless, the Moreno Defendants separately

agreed to reimburse these Fees to Sea Tow under the TARA, which the Court finds was adequately supported by consideration, contrary to the Moreno Defendants' arguments.

Under the Franchise Agreement, customers pay annual fees to be members of Sea Tow and to receive covered services from Sea Tow franchisees. The Membership Fees are paid to Sea Tow, divided by Sea Tow, and paid to the appropriate franchisee pursuant to a confidential formula found in Section 8.7 of the Franchise Agreement. Under Section 8.7, those Membership Fees paid to the franchisee "belong to the Franchisee." They are not paid to the franchisee to be held "in trust," as Sea Tow argues, because there is no language in Section 8.7 that can be read to support such a construction. Apparently acknowledging as much, Sea Tow turns to two other provisions in the Franchise Agreement, Sections 5.8 and 17.11, to support its interpretation. But these provisions clearly address a different scenario where, for whatever reason, a Sea Tow member pays its Membership Fees directly to the franchisee, rather than Sea Tow. In such a scenario, the franchisee is obligated to hold the Membership Fees in trust before remitting Sea Tow's pro rata share. To conflate the Franchise Agreement's distinct payment procedures would violate the canon of interpretation that obligates courts to interpret agreements by looking at the document as a whole and avoid rendering terms superfluous. Kaplan v. Kaplan, 106 N.Y.S.3d 102, 105 (N.Y. 2019) ("A contract should be

read as a whole, with every part interpreted with reference to the whole; if possible, the contract will be interpreted so as to give effect to its general purpose."). And because there are no allegations that the Membership Fees Sea Tow seeks were paid to TBM-Towing in the first instance, Sections 5.8 and 17.11 are inapplicable, and Section 8.7 controls.

Nevertheless, under the TARA, the Moreno Defendants agreed to pay these Membership Fees. The Moreno Defendants argue that the TARA is inoperable because it is not supported by consideration. Not so. Under the TARA, the Moreno Defendants acknowledged that TBM-Towing was required to return the at-issue Membership Fees paid to it by Sea Tow, and in return, Sea Tow agreed to forego taking action against the Moreno Defendants for allegedly violating the Franchise Agreement. Consideration need not be monetary, and it is well settled that "[f]orebearance of a legal right can constitute consideration." Aleph Towers, LLC v. Ambit Texas, LLC, No. 12-CV-3488, 2015 WL 13529957, at *2 (E.D.N.Y. June 29, 2015) (collecting cases).

In sum, while Sea Tow cannot recover the at-issue Membership Fees under the Franchise Agreement, it may pursue its breach of contract claims for such Fees against the Moreno Defendants under the TARA. Notably, to the extent Sea Tow seeks to recover these Membership Fees from the Jaeger Defendants based

on the Management Agreement, such a claim fails for the same reason that its claim under the Franchise Agreement fails.

### 3.   Contract Claims under the New Shute Note

Next, Sea Tow seeks to recover monies it paid to Shute under the New Shute Note.  Sea Tow guaranteed TBM-Towing and the Moreno's performance under the New Shute Note.  In the event the Moreno Defendants defaulted and Sea Tow's guarantee obligations were triggered, the New Shute Note provides that Sea Tow would reimburse itself by offsetting Membership Fees owed to TBM-Towing. The Moreno Defendants argue that the New Shute Note's terms therefore expressly provide Sea Tow with a procedure to recoup payments it made to Shute.  Although the Moreno Defendants do not explicitly argue as much, they appear to contend that this procedure is Sea Tow's exclusive remedy for any breach of the New Shute Note.

The Court is not convinced.  It is true that "courts must honor contractual provisions that limit liability or damages because those provisions represent the parties' agreement on the allocation of the risk of economic loss in certain eventualities." Nomura Home Equity Loan, Inc., Series 2006-FM2, by HSBC Bank USA, Nat'l Ass'n v. Nomura Credit & Cap., Inc., 92 N.E.3d 743, 748 (N.Y. 2017).  So, "[c]ontract terms providing for a 'sole remedy' are sufficiently clear to establish that no other remedy was contemplated by the parties at the time the contract was formed."

Id.  Here, however, the terms of the New Shute Note do not make it "sufficiently clear" that the offset provisions were intended to be the sole remedy for a breach.  Cf. J. D'Addario & Co. v. Embassy Indus., Inc., 980 N.E.2d 940, 943 (N.Y. 2012) (holding the "use of terms 'sole remedy,' 'sole obligation,' and 'no further rights' by the parties," alongside other provisions, made it "sufficiently clear" that the parties intended to exclude statutory interest from any damages award).

Accordingly, the Moreno Defendants' motion to dismiss Sea Tow's claim for breach of the New Shute Note is DENIED.

### 4.   Contract Claims based on Bankruptcy Disclosures

Sea Tow alleges Defendants breached the Franchise Agreement and their respective NCNDAs by disclosing Sea Tow's confidential information and documents to the TBM-Towing bankruptcy trustee and bankruptcy counsel in connection with the Bankruptcy Case, as well as by filing certain documents in the Bankruptcy Case.  The Moreno Defendants contend the disclosures to their counsel and the bankruptcy trustee are protected by the attorney-client privilege, and that the Bankruptcy Case filings are protected by the litigation privilege.  (Moreno Defs. Support Memo at 27-28.)  For their part, the Jaeger Defendants argue that the Management Agreement authorized their disclosure to TBM-Towing.  (Jaeger Defs. Support Memo at 24.)  Sea Tow does not

address these arguments, believing they "mandate[] even less of a response" than Defendants' other arguments.

For the reasons elucidated in their briefs, and which the Court adopts, the Court agrees with Defendants and concludes Sea Tow cannot state a plausible breach of contract claim based on Defendants' respective disclosures and filings in the Bankruptcy Case. Accordingly, Defendants' respective motions to dismiss Sea Tow's breach of contract claims based on the Bankruptcy Case disclosures and filings are GRANTED, and such claims are DISMISSED. Moreover, because Sea Tow's trademark claims against the Moreno Defendants are premised on the Bankruptcy Case disclosures, the trademark claims against the Moreno Defendants are similarly DISMISSED.

### 5. Contract Claims based on Non-Compete Agreements

Sea Tow alleges that the Jaegers "appear to have" breached their NCNDAs with Sea Tow. The Jaegers argue in response that the non-compete provisions are unenforceable or, in the alternative, the alleged violations of the NCNDAs are not adequately pleaded. The Court agrees with the Jaegers. Sea Tow has not plausibly alleged its breach of contract claim, having merely alleged that the Jaegers formed the "intention to violate their non-compete agreements" or "appear to have violated their non-compete agreement with Sea Tow."

Accordingly, the Jaeger Defendants motion to dismiss Sea Tow's breach of contract claim based on violations of the non-compete provisions in the NCNDAs is GRANTED, and such claims are DISMISSED.

### 6.   Remaining Contractual Disputes

Last, Sea Tow alleges TBM-Recovery and E. Jaeger violated the Management Agreement, as well as the Promissory Note executed in connection with the Management Agreement, by failing to pay Sea Tow the 15% gross revenue due and owing thereunder for May and June 2020.  The Jaeger Defendants do not address these assertions, which the Court finds to be adequately pleaded. Accordingly, Sea Tow may proceed with its breach of contract claim predicated on the foregoing allegations.

### D.   Trademark Infringement & NY GBL Claims

The Jaeger Defendants argue that Sea Tow fails to adequately plead a cause of action for trademark infringement and dilution under the Lanham Act.   At this juncture the Court disagrees, finding Sea Tow has adequately alleged violations of the Lanham Act for the reasons stated in its brief.[10]

---

[10] It appears to the Court that Sea Tow's trademark claims rise and fall with the termination of the Management Agreement.  That is to say, if Sea Tow is incorrect that the Jaeger Defendants violated the Management Agreement, then it cannot plausibly claim that the Jaeger Defendants' ongoing use of Sea Tow trademarks and trade dress was unauthorized.  Southland Corp. v. Froelich, 41 F. Supp. 2d 227, 242 (E.D.N.Y. 1999) ("Whether Froelich's use of Southland's marks is unauthorized depends on the validity of Southland's

Accordingly, the Court DENIES the Jaeger Defendants'
motion to dismiss Plaintiff's trademark claims ruling on the
trademark claims pending final resolution of Sea Tow's claims
against the Jaeger Defendants for breach of the Management
Agreement.  And because Sea Tow's NY GBL claims are premised on
Defendants' alleged unauthorized use of Sea Tow's trademarks and
trade dress, the Court similarly DENIES the Jaeger Defendants'
motion to dismiss that claim.

E.   <u>Replevin</u>

Sea Tow alleges a claim for replevin based on Defendants
alleged failure to return Sea Tow Know How to Sea Tow in violation
of various agreements executed by the parties.  Defendants argue
in response that Sea Tow cannot sustain an action for replevin
based on contractual violations.  The Court agrees.  "Under New
York law, an action for conversion and replevin should proceed
under a contract theory when the plaintiff is essentially seeking
enforcement of a contractual duty."  <u>Aleem v. Experience Hendrix,</u>
<u>L.L.C.</u>, No. 16-CV-9206, 2017 WL 3105870, at *5 (S.D.N.Y. July 20,
2017) (citing <u>Sommer v. Federal Signal Corp.</u>, 593 N.E.2d 1365,

---

termination of the franchise agreement with Froelich.  If the
franchise agreement was properly terminated, Froelich's license,
<u>i.e.</u>, his privilege, to use Southland's marks, also was revoked,
and irreparable harm is established as a matter of law.  On the
other hand, if the franchise agreement was not properly terminated,
then Froelich's license to use Southland's marks remains
intact.").

1369 (N.Y. 1992)).  For that reason, "courts have dismissed actions for conversion and replevin that are duplicative of a claim for breach of contract."  Id.  Because Sea Tow's claim for replevin is based on Defendants' alleged violation of their contractual obligations, it is hereby DISMISSED.

        F.    Florida State Law Claims

        Sea Tow also seeks dismissal of the Jaeger Defendants' claims under FDUPTA, arguing they are precluded by the parties' New York choice-of-law provision or otherwise not adequately pleaded due to the lack of allegations that the supposed deceptive or unfair practices occurred in Florida.  First, the Court does not agree that "merely because the state statutory claims are not grounded in New York law, they are precluded by the choice of law provision in the Franchise Agreement."  Maltz v. Union Carbide Chemicals & Plastics Co., 992 F. Supp. 286, 315 (S.D.N.Y. 1998). In fact, "the Second Circuit has explicitly rejected the argument urged here by defendants -- that a choice of law provision in a franchise agreement precludes statutory claims arising under the laws of states other than the state chosen by the parties to govern their contract disputes."  Id. (citing Valley Juice Ltd. v. Evian Waters of France, Inc., 87 F.3d 604, 612 (2d Cir. 1996)).  The Court further disagrees that the Third-Party Complaint fails to adequately allege consumer harm occurring in Florida, as it alleges the Jaegers are Florida residents and that the parties engaged in

phone calls, emails, and other correspondence regarding the transactions in Florida.

Accordingly, Sea Tow's motion for judgment on the pleadings on the Jaeger Defendants' FDUPTA claims is DENIED.

\*     \*     \*

The Court has considered the parties' remaining arguments and finds them to be without merit.

<u>CONCLUSION</u>

Accordingly, for the reasons stated herein, Defendants' respective motions to dismiss the Second Amended Complaint (ECF Nos. 172, 176) are GRANTED in part and DENIED in part, with:

(1) The fraud and conspiracy to defraud claim (Count I) DISMISSED as to the Jaeger Defendants and to the extent such claim is premised on the TBM-Towing Bankruptcy, but otherwise permitted to proceed based on the plausibly alleged misrepresentations made by the Moreno Defendants in connection with various agreements;

(2) The breach of contract claim for Membership Fees based on Defendants' alleged violation of the Franchise Agreement (Count IV) DISMISSED;

(3) The breach of contract claim for Membership Fees based on the Moreno Defendants' alleged violation of the TARA (Count IV) permitted to proceed;

(4) The breach of contract claim against the Moreno

Defendants (Count VI) for violation of the New Shute Note permitted to proceed;

(5)   The breach of contract claim against Defendants based on Defendants' disclosures and filings in the Bankruptcy Case (Count IV) DISMISSED;

(6)   The breach of contract claim against Defendants based on the Jaegers' alleged violations of the NCNDAs (Count IV) DISMISSED;

(7)   The breach of contract claims against the Jaeger Defendants based on their alleged violation of (a) the Management Agreement for failing to pay Sea Tow the 15% gross revenue due and owing thereunder for May and June 2020 (Count IV), and (b) the Promissory Note executed in connection with the Management Agreement (Count V) permitted to proceed;

(8)   The Lanham Act claims (Counts II and III) DISMISSED as against the Moreno Defendants, but permitted to proceed as against the Jaeger Defendants;

(9)   The NY GBL claim (Count VIII) permitted to proceed; and

(10) The claim for replevin (Count VII) DISMISSED.

Last, Sea Tow, Stein, and Frohnhoefer's motion for judgment on the pleadings (ECF No. 192) on the Jaeger Defendants' Third-Party Complaint is GRANTED in part and DENIED in part, with:

(1)   The NYFSA claims for registration and disclosure

violations under Section 683 (Counts I, II, III) permitted to proceed;

(2)   The NYFSA fraud claims under Section 687 (Count IV) DISMISSED;

(3)   The Florida State Law claims (Counts V, VI, VII) permitted to proceed; and

(4)   The remaining claims in the Third-Party Complaint permitted to proceed.

**SO ORDERED.**

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: September  30 , 2022
        Central Islip, New York